## COMMONWEALTH *vs.* SEAN SEABROOKS.

Hampshire. November 9, 2000. - March 12, 2001.

Present: MARSHALL, C.J., GREANEY, SPINA, COWIN, & SOSMAN, JJ.

*Jury and Jurors. Constitutional Law,* Jury. *Practice, Criminal,* Jury and jurors, Challenge to jurors, Voir dire, Capital case. *Witness,* Expert. *Evidence,* Expert opinion, Rebuttal. *Privileged Communication.*

At the trial of murder indictments, there was no error in the judge's seating four jurors he had determined to be impartial and who were not challenged by the defendant for cause [441-443], and the judge properly, after lengthy and probing voir dire, declared impartial a juror the defendant had challenged [443-445]; further, there was no error in the judge's determination that the deliberating jurors had remained impartial and had complied with his instructions regarding their behavior during the trial [445].

At a murder trial, the judge did not abuse his discretion in refusing to excuse for cause and finding indifferent fourteen jurors, on whom the defendant then exhausted his peremptory challenges. [445-446]

In a murder case in which the defendant raised the issue of his criminal responsibility, the judge did not err or abuse his discretion in determining, pursuant to G. L. c. 233, § 20B (*c*), that the interests of justice required that the defendant's communications with a forensic psychologist, who had on five occasions examined the defendant for risk of suicide while he was held in jail, were not privileged and that the psychologist could testify as to the communications [448-451]; further, the admission of the defendant's communications did not violate his privilege against self-incrimination [451].

INDICTMENTS found and returned in the Superior Court Department on January 27, 1993.

Following review by this court, 425 Mass. 507 (1997), the cases were tried before *Daniel A. Ford,* J.

*Elaine Pourinski,* Committee for Public Counsel Services, for the defendant.

*Judith Ellen Pietras,* Assistant District Attorney, for the Commonwealth.

MARSHALL, C.J. A jury convicted the defendant of murder in the first degree of his companion, Sherry Morton, on theories of

deliberate premeditation and extreme atrocity or cruelty, and of murder in the first degree of their son on a theory of extreme atrocity or cruelty. He contends that he was denied the right to a fair trial by an impartial jury, and that the admission of testimony by a State psychologist who examined him after the murders violated his State and Federal rights against self-incrimination. The defendant also seeks relief under G. L. c. 278, § 33E. We affirm the convictions, and conclude that no relief under G. L. c. 278, § 33E, is warranted.

1. *Background.* In April, 1994, the defendant was first convicted of the murders of Morton and their son. We reversed the convictions, holding that the admission at trial of Morton's statement to a friend that the defendant had injured her, as well as the exclusion of evidence that she had recanted the statement, was reversible error. *Commonwealth* v. *Seabrooks*, 425 Mass. 507, 511-512 (1997).

The defendant was retried in May, 1998. We summarize the evidence presented at the second trial. On the evening of January 11, 1993, the defendant called a coworker and told him that he had just killed his former girl friend, Sherry Morton, and their infant son. The coworker notified the Northampton police, who went to Morton's apartment. They found the two victims on the floor in the bedroom. A knife, with only the handle visible, protruded from Morton's right cheekbone. The baby's body was lying next to his mother. He had been stabbed eleven or twelve times. There were blood spatters and smears on the shower wall, bedroom walls, ceiling, and bed. Forensic examination revealed that Morton had been stabbed fifty-six times. Forty-two stab wounds on her shoulders, arms, and hands indicated that she vigorously attempted to defend herself.

At approximately the same time that Northampton officers were at Morton's apartment, Springfield police officers responded to an emergency telephone call from the defendant's father about a domestic dispute. The defendant's father directed them to the defendant, who was walking nearby, talking to himself. As the officers approached, they heard the defendant repeating statements such as "they're gone, she's gone, the baby's gone," and "they're gone, it's too late." In response to questions about what he was referring to, the defendant said,

"Don't you get it? It's too late." He also said: "I did it with a knife." He was placed under arrest and taken into custody.

After waiving his Miranda rights, the defendant told the police that he stabbed Morton at least twice in the chest. He also admitted to stabbing the baby in the chest. The defendant said that, when he realized the victims were dead, he attempted to commit suicide by electrocuting himself in the bathtub. We discuss in Part 3, *infra,* evidence introduced at trial concerning a series of suicide risk assessments of the defendant conducted by forensic psychologist Dr. Michael Sherry in the days immediately following the killings.

2. *Jury empanelment.* Prior to the start of his second trial, the defendant moved for a change of venue because of pretrial publicity.[1] The motion judge allowed a venue change, denied the motion to move the trial to a central or eastern county of the Commonwealth, and transferred the case to Berkshire County. Five days before the start of the second trial, the Berkshire Eagle newspaper reported, among other details, that the defendant previously had been tried and convicted, and had received two consecutive life sentences.

The judge conducted individual voir dire concerning the effects of the pretrial publicity. A number of prospective jurors said that they had read the Berkshire Eagle report, had seen or heard other reports about the case in various media, or had heard other potential jurors talking about the case outside the court room on the day of jury selection.[2] The judge excused for cause all potential jurors who said that they were aware that the defendant previously had been convicted of the murders, as well as two others who had read the Berkshire Eagle report and were uncertain whether it announced the outcome of the first trial. He also excused one juror who expressed racial bias, several who said that they could not be impartial, and one who

[1] In an accompanying affidavit, defense counsel cited "intense" attention to the case from 1993 to 1998 by the media, as well as numerous vigils against domestic violence that had been held in connection with the case.

[2] The first juror questioned told the judge that she heard jurors "in the other room" talking about the case. Thereafter, the judge asked each prospective juror some version of the following question: "Have you heard anyone talking about the case here today in the courthouse, including other jurors?"

formerly had served as a police officer. The judge did not excuse fourteen jurors whom the defendant challenged for cause.

On four separate occasions during the voir dire the defendant moved to strike the entire venire because of prejudicial pretrial publicity. The judge denied the motion each time, but did allow two additional peremptory challenges to each party, noting that the decision of the Berkshire Eagle to publish on the eve of trial the fact of the defendant's prior convictions posed particular difficulties in the empanelment process.

On appeal the defendant challenges on Federal (Sixth Amendment to the United States Constitution) and State (art. 12 of the Massachusetts Declaration of Rights) constitutional grounds the judge's failure to excuse five deliberating jurors for cause because they had been exposed to allegedly prejudicial information about the case. He also maintains that, because he was required to exercise (and thereby exhaust) his peremptory challenges on a number of jurors whom the judge should have excused for cause, he was denied his right to challenge peremptorily one juror whom he otherwise would have challenged.

Article 12 and the Sixth Amendment guarantee a criminal defendant the right to a trial before an impartial jury. *Commonwealth* v. *Vann Long*, 419 Mass. 798, 802 (1995). Those guarantees do not require that jurors have no prior knowledge of the alleged crime; jurors can reach impartial decisions in the face of significant hostile publicity surrounding a case. See *Boston Herald, Inc.* v. *Sharpe*, 432 Mass. 593, 610-611 (2000), and cases cited; *Commonwealth* v. *Jackson*, 391 Mass. 749, 755 (1984), citing *Dobbert* v. *Florida*, 432 U.S. 282, 302-303 (1977) ("Jurors need not be absolutely ignorant of the facts and issues involved in a case to be able to make an impartial judgment"). Individual voir dire of prospective jurors concerning their exposure to pretrial publicity is one proper way of ensuring that each selected juror is able to render a fair and impartial verdict. See *Boston Herald, Inc.* v. *Sharpe, supra* at 611. See also G. L. c. 234, § 28.[3]

We afford a trial judge "a large degree of discretion" in the

[3]General Laws c. 234, § 28, provides in part: "[I]f it appears that, as a result of the impact of considerations which may cause a decision or decisions

jury selection process. *Commonwealth* v. *Vann Long, supra* at 803. *Commonwealth* v. *Ascolillo*, 405 Mass. 456, 459 (1989). Where, as here, a judge has explored the grounds for any possible claim that a juror cannot be impartial, and has determined that a juror stands indifferent, we will not conclude that the judge abused his discretion by empanelling the juror unless juror prejudice is manifest. See *Commonwealth* v. *Ferguson*, 425 Mass. 349, 354 (1997); *Commonwealth* v. *Vann Long, supra*. The judge, of course, must be "zealous to protect the rights of an accused," *id.*, quoting *Wainwright* v. *Witt*, 469 U.S. 412, 430 (1985), and his inquiry into impartiality must be fair and neutral. *Commonwealth* v. *Auguste*, 414 Mass. 51, 58 (1992). Guided by these well-established principles, we reject the defendant's challenges.

At trial the defendant did not challenge four of the five jurors whom he now claims should have been excused for cause. All four stated that they had learned no specific facts about the murders or the prior proceedings; they also stated unequivocally that they could be fair and impartial. Nothing in the record suggests that these jurors were aware of a previous trial, the outcome of that trial, or that allegations of domestic abuse had been made against the defendant. There was no error in seating these four jurors.

At trial the defendant did challenge the fifth juror for cause. The defendant contends that the judge should have excused her because she told the judge that her "initial emotional response" to his introduction of the issues in the case was that she felt "differently about a child being harmed." He also points out that she overheard other prospective jurors talking about the case. We defer to the judge's conclusion not to excuse this juror, because he had the opportunity to observe her demeanor while he questioned her at some length, and because her answers

to be made in whole or in part upon issues extraneous to the case, including, but not limited to, community attitudes, possible exposure to potentially prejudicial material or possible preconceived opinions toward the credibility of certain classes of persons, the jury may not stand indifferent, the court shall . . . examine the juror specifically with respect to such considerations, attitudes, exposure, opinions or any other matters which may . . . cause a decision or decisions to be made in whole or in part upon issues extraneous to the issues in the case."

to his probing questions allayed any concerns he might have had. Cf. *Commonwealth* v. *Auguste, supra* at 57-58. The judge examined her twice to ensure that she could put aside her reservations. There is nothing in the record to suggest that this juror had formed any opinion that might have prevented her from reaching a fair decision based on the evidence.

We also reject the defendant's claim, raised for the first time on appeal, that this same juror should have been removed for cause because of her response to the judge's inquiry concerning evidence pertaining to mental disorders.[4] It is apparent that one of her responses to the judge's questions, although a seeming admission of partiality, reflected a misunderstanding of that particular question. The judge asked careful and probing questions throughout the voir dire, notably when any prospective juror displayed any ambivalence or answered a question in any way suggesting a possible inability to be impartial. As the judge did not press this juror about that particular response (that was contrary to her response to the immediately preceding question), and it did not prompt any objection by either counsel, we discern that counsel and the judge understood her answer to mean that she could be impartial concerning any evidence of mental disorders.

The defendant's claim that information presented at trial might have caused these same five jurors to remember more of what they previously had heard or read is mere speculation. Moreover, the judge instructed the jurors to refrain from discussing the case; to have no contact with the witnesses, parties, or attorneys; and to avoid all media coverage of the trial. He questioned them each day concerning their compliance with his

---

[4]The claim arises from the following exchange during her colloquy with the judge:

THE JUDGE: "There may be testimony in this case from a number of psychiatrists, psychologists, and other mental health professionals. Would you be able to hear such testimony and to judge it with a fair and open mind?"

THE JUROR: "I believe so."

THE JUDGE: "All right. Is there any reason why you would be unable to evaluate evidence pertaining to mental disorders in a fair and impartial way?"

THE JUROR: "Yes."

instructions. On the final day of trial, at defense counsel's request, the judge also conducted a second, individual voir dire of all deliberating jurors concerning their compliance with his instructions. No juror expressed any doubt about his or her ability to be impartial. The judge was entitled to accept the jurors' declarations of disinterest both during and after voir dire. See *Commonwealth* v. *Ferguson, supra* at 353; *Commonwealth* v. *Colon-Cruz*, 408 Mass. 533, 551 (1990).

We next consider the defendant's claim that the judge committed reversible error by requiring him to exhaust peremptory challenges on fourteen jurors who should have been excused for cause. An error occurs if a judge refuses to excuse any juror who should be excused for cause, and as a result the defendant exhausts all peremptory challenges and is forced to accept a juror whom he otherwise would properly have challenged. *Commonwealth* v. *Susi*, 394 Mass. 784, 789 (1985). The judge did not abuse his discretion in refusing to excuse for cause any of the fourteen jurors peremptorily challenged by the defendant. Of those fourteen, eleven of them had heard, seen, or read something about the case prior to the trial. As to the remaining three, one expressed initial concern that her ability to be impartial would be affected because a child was a victim; one had been a victim of domestic assault; and the defendant claims that one "raised his eyes and smiled" when asked whether "black persons" are more or less likely to commit a crime. The judge questioned each of the fourteen jurors individually and carefully. He had the opportunity to observe their demeanor as they responded to his queries. He often asked further questions when a juror's answers were unclear or revealed a potential ground for bias. He found each juror to be indifferent only after each had stated with clarity that he or she could be fair and impartial.[5] The judge's careful examination was calculated to assess each juror's impartiality and elicited no evidence of any

---

[5]Based on our examination of the record, it is apparent that only three of the eleven had been exposed to even arguably prejudicial information. One stated that she had read that "there was a murder trial coming to Pittsfield and that a woman and her child were killed," but could recall no other details. Two others stated that newspaper articles reported that the defendant had killed his girl friend and child, but when pressed by the judge, both indicated

bias. The defendant was entitled to, and received, "a jury capable and willing to decide the case solely on the evidence before it." *Smith* v. *Phillips*, 455 U.S. 209, 217 (1982).

3. *Admission of expert testimony.* While held at the Hampshire County house of correction after the killings and his claimed suicide attempt at the scene of the crime, the defendant was examined at the request of jail officials on five separate occasions between January 14, 1993, and January 25, 1993 (the defendant was arrested on January 11), by Dr. Michael Sherry, a forensic psychologist with the Behavioral Health Network of Springfield. The purpose of Dr. Sherry's examinations was to determine whether the defendant, who had been placed on a suicide watch at the jail, was suicidal, and to assess whether he needed to remain on a suicide watch or to be placed under twenty-four hour supervision by jail officials, or required hospitalization because he was "at acute current risk of hurting [himself]." Dr. Sherry also conducted a general mental health evaluation of the defendant in the course of the five examinations. The defendant consulted with his attorney before communicating with Dr. Sherry, and as a consequence refused to discuss certain information about the murders and his failed suicide attempt.

At trial the defendant did not dispute that he killed the victims. The critical issue was his degree of criminal responsibility. In his defense the defendant presented two expert witnesses who testified that he suffered from a mental defect or disorder at the time of, and immediately following, the killings. Dr. Ronald Ebert, a forensic psychologist, testified that the defendant suffered from acute stress disorder with a dissociative component at the relevant time. He based his opinion on interviews with the defendant's friends and family, four evaluations of the defendant, and various records in the case, including Dr. Sherry's records of the defendant's behavior, appear-

that the articles stated only that the defendant was accused of the murders. The judge asked each of the eleven a version of the following question: "Did what you hear, read or see cause you to form any opinions about the case that would prevent you from being a fair and impartial juror?" They all responded unequivocally that it did not. A juror's exposure to details of the crime, without more, is insufficient justification to remove the juror for cause where the juror states clearly that he or she can assess the evidence in the case fairly and impartially.

ance, and statements during the suicide risk evaluations.[6] Dr. David Rosmarin, a forensic psychiatrist, testified for the defense that, when the defendant killed the victims, he was suffering from alcohol and marijuana intoxication and dissociative disorder not otherwise specified. He also testified that, when the defendant was arrested by the police and later questioned at the jail, he was intoxicated with marijuana and alcohol and was suffering from acute stress disorder. His conclusions were based on four lengthy interviews with the defendant, as well as a review of numerous documents including police reports, witness statements, autopsy reports, booking and crime scene videotapes, transcripts from prior hearings, the defendant's high school and work records, and the "treatment record" from the jail where the defendant was incarcerated after the killings.[7]

To rebut the opinion testimony of these two experts that the defendant suffered from acute stress disorder, the Commonwealth called Dr. Sherry. Over the defendant's objections, Dr. Sherry testified that, in his opinion, the defendant was not suffering from acute stress disorder between January 14 and January 25, 1993. He based this opinion primarily on his records of the suicide risk assessments.

The defendant asserts that the admission of Dr. Sherry's testimony violated his State (art. 12) and Federal (Fifth Amendment to the United States Constitution) constitutional rights

[6]It is clear from Dr. Ebert's testimony that, in formulating his opinion, he relied in part on Dr. Sherry's records of the suicide risk evaluations. Dr. Ebert testified that the "reports in the prison record that describe [the defendant's] mental state the day after [the murders] and then days — a few days later" were "relevant" and "necessary" to his professional opinion that the defendant suffered from acute stress disorder. He also testified that the defendant was "seen a number of times on the day of the incarceration, the next day, days after, by clinicians who are employed to review people who may be suicidal or may be at some risk, and their report of his behavior fits with his description of his behavior."

[7]The record is not clear as to whether Dr. Rosmarin relied specifically on Dr. Sherry's records when he concluded that the defendant suffered from acute stress disorder. He testified that he relied in part on the "house of correction treatment record" when he formulated his opinion as to the defendant's mental state. He also testified that "there is a substantial question of [the defendant's] suicidality when he was first held at the house of correction, and he was on suicide watch for several days because of clinical examinations and their concern about him."

against self-incrimination, and was contrary to the statutory protection of the psychotherapist-patient privilege, G. L. c. 233, § 20B.[8] The testimony should not have been admitted, he claims, because Dr. Sherry did not warn him prior to the suicide evaluations that his communications might not be kept confidential. See *Commonwealth* v. *Lamb*, 365 Mass. 265, 270 (1974).

We agree with the judge that Dr. Sherry's disclosure of the defendant's communications was permissible in this case under the third of the statutory exceptions to the psychotherapist-patient privilege, G. L. c. 233, § 20B (*c*). It provides that a patient may not claim the protection of G. L. c. 233, § 20B, if "[i]n any proceeding, except one involving child custody, adoption or adoption consent, . . . the patient introduces his mental or emotional condition as an element of his claim or defense, and the judge . . . finds that it is more important to the interests of justice that the communication be disclosed than that the relationship between patient and psychotherapist be protected." G. L. c. 233, § 20B (*c*).

Both prongs of this two-part test were met here. First, the defendant introduced his mental and emotional condition as an element of his defense by eliciting testimony from two expert witnesses that, at the time of the murders, he suffered from acute stress disorder and a dissociative disorder not otherwise specified.

Second, the judge did not abuse his discretion or commit error of law by determining that the interests of justice warranted disclosure of the confidential communications. As the statute itself makes clear, the introduction of a defendant's mental or emotional condition in a later proceeding is insufficient, without

---

[8]In pertinent part, the statute provides that "in any court proceeding . . . a patient shall have the privilege of refusing to disclose, and of preventing a witness from disclosing, any communication, wherever made, between said patient and a psychotherapist relative to the diagnosis or treatment of the patient's mental or emotional condition." G. L. c. 233, § 20B. For the purposes of the statute, "communications" include not only a patient's conversations with a psychotherapist, but also "records, memoranda or notes" of those interactions. G. L. c. 233, § 20B. See *Department of Youth Servs.* v. *A Juvenile*, 398 Mass. 516, 526 (1986) (privilege applies where doctor testifies to diagnosis based on interviews with accused, even if doctor reveals no specific communications).

more, to bring the defendant's privileged communications within the exception. In this case, however, a number of factors justified the judge's conclusion that the interests of justice in disclosure outweighed the need to protect the defendant's otherwise confidential communications. First, the defendant and Dr. Sherry had no ongoing relationship that would have been damaged or destroyed by the disclosure of the communications made in January, 1993. Second, the truth-seeking function of the trial would have been seriously impaired had Dr. Sherry's testimony been excluded. As we noted previously, one of the defendant's experts, Dr. Ebert, based his opinion that the defendant had suffered from acute stress disorder in part on Dr. Sherry's own records of the suicide risk evaluations.[9] It is also likely that Dr. Rosmarin's opinion relied at least in part on communications the defendant made to Dr. Sherry. See note 7, *supra.* Because Dr. Ebert and Dr. Sherry relied on the same communications by the defendant, but drew differing conclusions about his mental state, it was important to present to the jury Dr. Sherry's opinion testimony so that they could assess whether the defendant labored under any mental illness around the time of the murders. See, e.g., *Blaisdell* v. *Commonwealth,* 372 Mass. 753, 766 (1977) (jury aided in discharging their responsibility to make a "true and valid determination of the issues . . . opened by a defendant" where they are presented countervailing expert opinions based on similar testimonial statements by defendant). Third, the suicide evaluations, conducted within days of the killings, were the only examinations of the defendant conducted at or around the relevant time period. Fourth, the defendant consulted with his attorney before he agreed to communicate with Dr. Sherry. Finally, on the advice of his attorney the defendant did not discuss with Dr. Sherry details of the crime or of his suicide attempt in the victim's

---

[9]Dr. Ebert testified that the defendant told Dr. Sherry and other clinicians who conducted the suicide risk assessments that he refused to "contract for safety" with the psychotherapists, repeatedly stated during the evaluations that "this is all like a dream," and denied telling another inmate that he would kill himself.

apartment. The combination of these five circumstances justified disclosure of the communications.[10]

The defendant asserts that the admission of Dr. Sherry's testimony was improper because Dr. Sherry failed to give him any warnings that we have said are required in some circumstances. *Commonwealth* v. *Lamb*, 365 Mass. 265, 270 (1974).[11] We disagree. Our conclusion in *Lamb*, that a patient's communications to a psychotherapist in a court-ordered evaluation may not be disclosed against the patient's wishes absent a warning that the communications would not be privileged, was based on a construction of the second exception to the privilege against disclosure, G. L. c. 233, § 20B (*b*).[12] See *Commonwealth* v. *Morais*, 431 Mass. 380, 383 (2000); *Department of Youth Servs.* v. *A Juvenile*, 398 Mass. 516, 526 (1986). General Laws c. 233, § 20B (*b*), is not applicable to this case. Dr. Sherry's examinations were not ordered by the court or sought by the prosecution, and were not conducted in anticipation of a future

---

[10]We do not mean to suggest that the presence of any particular factor or combination of factors is required as a prerequisite to disclosure of a patient's communications pursuant to G. L. c. 233, § 20B (*c*). Whether "it is more important to the interests of justice that the communication be disclosed than that the relationship between patient and psychotherapist be protected" must be determined in light of all factors presented. G. L. c. 233, § 20B (*c*).

[11]At trial, defense counsel objected to Dr. Sherry's testimony, arguing that the defendant's statements to Dr. Sherry were privileged because Dr. Sherry had not issued warnings as required by *Commonwealth* v. *Lamb*, 365 Mass. 265, 270 (1974), and that without the statements made by the defendant Dr. Sherry had no foundation to offer an opinion concerning the defendant's alleged mental disorders shortly after the murders. Dr. Sherry testified, outside the presence of the jury, that he did not issue *Lamb* warnings to the defendant. The prosecutor then informed the judge that Dr. Sherry had told her that at some point during the suicide risk assessment he *had* told the defendant that anything the defendant said would not remain confidential if it appeared that the defendant might harm himself or the safety of a third party was at risk. Because we determine that G. L. c. 233, § 20B (*b*), is inapplicable to this case, we do not need to resolve whether Dr. Sherry's alleged disclaimer qualified as a *Lamb* warning.

[12]General Laws c. 233, § 20B (*b*), provides that the psychotherapist-patient privilege does not protect a patient's communications from disclosure "[i]f a judge finds that the patient, after having been informed that the communications would not be privileged, has made communications to a psychotherapist in the course of a psychiatric examination ordered by the court, provided that such communications shall be admissible only on issues involving the patient's mental or emotional condition but not as a confession or admission of guilt."

proceeding in which the defendant's mental capacity would be at issue. Cf. *Department of Youth Servs.* v. *A Juvenile, supra* (under *Lamb*, Commonwealth's examinations of a juvenile prior to a commitment hearing, "if they were to be the basis of the expert's opinion, should have been preceded by the *Lamb* warnings"). Rather, Dr. Sherry conducted the risk assessments to identify whether the defendant was at imminent risk of harming himself and to recommend any necessary precautions or treatment.

The defendant claims that the admission of his communications to Dr. Sherry also violated his Federal and State constitutional privileges against self-incrimination because he was not warned that his communication with Dr. Sherry would not remain confidential.[13] For the privileges to attach, the State must compel the defendant to produce testimonial evidence. See *Blaisdell* v. *Commonwealth, supra* at 758-759, and cases cited. Here, the defendant consulted with his attorney before he met with Dr. Sherry, and agreed to discuss some, but not all, matters with him. More importantly, the defendant, through the testimony of his experts, introduced in evidence his communications to Dr. Sherry. Cf. *Department of Youth Servs.* v. *A Juvenile, supra* at 526 n.12; *Commonwealth* v. *Barboza*, 387 Mass. 105, 113 (1982).

4. *Review under G. L. c. 278, § 33E.* The defendant invites us to exercise our discretionary power under G. L. c. 278, § 33E, to order a new trial or, alternatively, to reduce the convictions to second degree murder. He points to the asserted errors in jury selection, as well as circumstances that he claims mitigate the seriousness of the crimes.[14] We have reviewed the

---

[13]We reject the defendant's assertion that he was "accorded no due process rights whatsoever" when he was interviewed by Dr. Sherry without *Lamb* warnings. Assuming, arguendo, that due process requires a *Lamb*-style warning, the due process violation occurs when the Commonwealth introduces evidence garnered in the absence of *Lamb* warnings, not when the accused speaks to the psychotherapist. See *Commonwealth* v. *Lamb*, 365 Mass. 265, 270 (1974).

[14]As mitigating circumstances, the defendant notes that there was no evidence suggesting that he planned to kill the victims when he went to their apartment, or that he was indifferent to the killings or took pleasure in them. He also emphasizes that he was a responsible worker, that there was no

record in accordance with our statutory obligation under G. L. c. 278, § 33E, and discern no substantial likelihood of a miscarriage of justice in the defendant's convictions. We see no reason to exercise our power to order a new trial or to reduce the verdicts.

*Judgments affirmed.*

---

evidence that he had a history of abusing Morton, and that there was credible evidence that he was under mental strain on the day of the murders.