COMMONWEALTH *vs.* JAIME J., a juvenile.

No. 99-P-1067.

Middlesex. March 13, 2002. - October 18, 2002.

Present: LAURENCE, SMITH, & MILLS, JJ.

*Jury and Jurors. Practice, Criminal,* Jury and jurors, Examination of jurors, Challenge to jurors, Instructions to jury. *Joint Enterprise.*

This court concluded that a juvenile was not deprived of State constitutional due process during jury selection at his criminal trial by the manner in which the judge handled his challenges for cause, where, despite many inaudible gaps in the record, the empanelment proceedings, reviewed as a whole through the original transcript, the reconstructed transcript, and the audio recording, demonstrated that the judge was sufficiently thorough, followed established procedures, questioned any juror who vacillated in response to questions about bias, and excused many potential jurors. [270-276]

At the trial of a juvenile on charges of murder in the first degree on a joint venture felony-murder theory, the juvenile was not entitled to an instruction pursuant to *Commonwealth* v. *Watson*, 388 Mass. 536 (1983), *S.C.*, 393 Mass. 297 (1984), that he could not be found guilty of joint venture felony-murder unless the Commonwealth proved beyond a reasonable doubt that he knew that his accomplice was armed, where the uncontradicted evidence at trial firmly established that the juvenile possessed the weapon in question and used it to kill the victim. [276-277]

COMPLAINTS received and sworn to in the juvenile session of the Cambridge Division of the District Court Department on September 21, 1992, and October 6, 1992, respectively.

The cases were tried before *Roanne Sragow*, J., and a motion for a new trial, filed on May 25, 2000, was heard by her.

*Robert L. Sheketoff* for the juvenile.

*David W. Cunis*, Assistant District Attorney, for the Commonwealth.

MILLS, J. On January 14, 1994, the juvenile was found delinquent in the Cambridge District Court juvenile jury session by reason of two armed robberies and murder in the first degree.

The trial proceedings were intended to be recorded on tape (electronically), rather than by a court reporter. Gaps in the tape, however, rendered portions of the record inaudible and, therefore, unintelligible despite the efforts of the judge and parties to reconstruct it. The juvenile now appeals from his findings of delinquency and the denial of his motion for a new trial. He argues that the record could not be sufficiently reconstructed to evaluate fairly his claims that his State and Federal rights to an impartial jury were violated; that he was deprived of State constitutional due process by the manner in which his challenges for cause were handled; and that the judge's instructions on joint venture were erroneous. We hold that the reconstructed record is sufficient for review; that there was no error in the judge's denial of the juvenile's challenges for cause; and that the joint venture instructions were correct.

1. *Procedural history.* The juvenile was complained against for two armed robberies, G. L. c. 265, § 17, and indicted for murder in the first degree, G. L. c. 265, § 1. After a transfer hearing, in which the judge ordered that the case remain in the juvenile system, the juvenile was tried without a jury, and on October 7, 1993, he was found delinquent on the three charges. Upon his claim for a jury trial, the juvenile was again found delinquent on January 14, 1994. His appeal, originally docketed in the Supreme Judicial Court, was transferred to this court on June 18, 1999.

After efforts to reconstruct the transcript were made by counsel and the trial judge, a better quality transcript with fewer gaps was created. The juvenile then filed a motion for a new trial, arguing that the record was still insufficient to present his appellate claims. The trial judge denied the motion after a hearing, finding that the reconstructed transcript was sufficient.

2. *The facts.* The jury were presented with sufficient evidence to find the following facts. The victim, Yngve Raustein, was a twenty-one year old student at Massachusetts Institute of Technology, visiting from Norway. On September 18, 1992, at approximately 9:00 P.M., while Raustein was walking with his friend Arne Fredheim on Memorial Drive in Cambridge, the juvenile and two companions, Alfredo Velez and Joseph Donovan, approached and exchanged some words. Donovan's

remarks became hostile, and before Raustein could respond, Donovan punched him in the face and knocked him to his hands and knees. Fredheim then heard a clicking sound emanating from where the juvenile was standing, and saw a knife in the juvenile's hand. Fredheim noticed the juvenile move toward Raustein, but Velez moved in front of him, blocking Fredheim's view of Raustein. Velez then demanded Fredheim's wallet, and after Fredheim complied, Velez turned to flee. At this point, Raustein was still on his knees, although now bent forward, and the juvenile was leaning over him, using Raustein's shirt to wipe blood off the knife blade.

The juvenile, Velez, and Donovan ran from the scene leaving Raustein on his knees in a sitting position clutching his chest. Fredheim asked Raustein what happened and Raustein told Fredheim that the attackers took his wallet. Raustein struggled to stand up and, as he tried to straighten himself, staggered two or three steps and fell down on his back. Fredheim then noticed that Raustein's shirt was soaked in blood. When Fredheim lifted the shirt he saw a knife wound in the middle of Raustein's chest. Fredheim tried to stop the bleeding with his hands and shouted for help. However, the bleeding would not stop. Raustein said nothing more and died within minutes.

Additional evidence was presented concerning police action, pursuit, the arrest of the juvenile and his accomplices near Kenmore Square, and the finding of the juvenile's knife. After the juvenile was arrested, chemical tests indicated the presence of blood on his right index finger and left thumb webbing. Blood was also detected on his blue jeans and right sneaker. The blood type was consistent with that of Raustein and inconsistent with the juvenile's blood type.[1] Blood and the juvenile's fingerprints were found on the knife. There was expert testimony from a pathologist that the juvenile's knife was consistent with the type of instrument that caused Raustein's fatal wound. Other details will be included in our discussion, as necessary.

3. *Jury selection.* The empanelment of the jury was conducted in the courtroom by the judge in the presence of the attorneys, clerk, and court officers. In accepted and traditional fashion, the

---

[1] No blood was found on the clothing of Velez or Donovan.

judge introduced the juvenile and the attorneys, recited a brief statement of the case, and identified a list of potential witnesses. Upon admonition "to be as honest and forthright as possible," the prospective jurors were collectively questioned along the lines prescribed by G. L. c. 234, § 28.[2] Prior to the general questions, the jurors had been informed that those with affirmative responses would be individually interviewed by the judge at "sidebar." After numerous affirmative responses, the judge questioned the responding jurors under the close watch of the attorneys.[3] Every one of the jurors was asked, in substance, by the judge: "Do you feel that you could remain impartial and unbiased?" and "Could you decide this case based solely on the evidence you hear in this court room and disregard anything that you may have seen or heard outside this court room?" The judge's inquiries to the individually questioned jurors intended to unmask any weakness in their ability to serve impartially. We conclude that the content of the general and specific inquiries, together with their responses, are sufficiently clear to enable us to review the juvenile's complaints as to the adequacy of the reconstructed transcript and the judge's denials of his eight challenges for cause.

A trial judge has broad discretion in determining the partial-

[2]The judge's questions addressed the jurors' relationship to the juvenile, lawyers or witnesses; interest or stake in the case; knowledge of the case, especially with respect to pretrial publicity in newspapers, magazines, radio or television; preformed opinion, bias, or prejudice toward either the juvenile or the prosecution; knowledge or information about the juvenile; willingness to abide by the presumption of innocence; understanding of the Commonwealth's burden and the right of the juvenile to not produce evidence; whether family included district attorney, law enforcement, or correctional personnel; family or other close ties with law enforcement, police, correction, or jail personnel or agencies; family member or close friend or individual experience as a victim of an assault, robbery, or other violent crime; and whether there was any known "reason whatsoever why you would not be impartial in this case and be able to render a true and just verdict, based solely on the evidence and the law."

[3]We have listened to the available audiotape of the conversations in conjunction with our review of the reconstructed transcript. The individual interviews between the judge and the eight challenged jurors will be detailed *infra*. We have been able to discern a slightly more intelligible conversation than in the original transcript using the reconstructed transcript, coupled with the audio record. Each speaker's tone and other voice characteristics were apparent from the audio record.

ity of a prospective juror. *Commonwealth* v. *Ferguson*, 425 Mass. 349, 353 (1997). When a trial judge — who is in a much better position than an appellate court to evaluate a prospective juror's ability to be impartial — has examined a juror for possible bias and declared her indifferent, appellate courts defer to the judge's discretion "unless juror prejudice is manifest." *Commonwealth* v. *Seabrooks*, 433 Mass. 439, 443 (2001). See *Commonwealth* v. *Ascolillo*, 405 Mass. 456, 460 (1989) (judge's determination on partiality of prospective juror "will not be disturbed on appeal unless the [juvenile] demonstrates that there was a substantial risk that the case would be decided in whole or in part on the basis of extraneous issues"). "The determination of a juror's impartiality 'is essentially one of credibility, and therefore largely one of demeanor. . . .' " *Commonwealth* v. *Ferguson*, *supra* at 352-353, quoting from *Patton* v. *Yount*, 467 U.S. 1025, 1038 (1984).

The juvenile made several challenges for cause as the individual jurors were seated. Some of the challenges were granted, and some denied. After some challenges were denied, the juvenile exercised peremptory challenges as to five jurors (18-7, 11-15, 17-5, 17-14, and 12-1). No peremptory challenge was used as to juror 17-1, and by the time jurors 12-10 and 1-11 were called, the juvenile had exhausted his peremptory challenges. These last three jurors were seated and, apparently, deliberated. We will discuss the individual jurors as to whom cause challenges were denied and error now claimed.

Juror[4] 11-15 responded that he had once been robbed at gun point. The judge asked if he could be impartial, and it is reasonably inferable that he answered affirmatively. That a venire member has experience as a crime victim does not automatically make him partial and, hence, disqualified. See *Commonwealth* v. *Mahoney*, 406 Mass. 843, 849-851 (1990). This juror was forthright, and the record establishes that the judge expressly questioned him about the experience, observed his demeanor, and heard the tone as well as the content of his responses. In these circumstances, we defer to the "trial judge's determination of impartiality." *Commonwealth* v. *Ferguson*, 425

[4]Potential jurors who were peremptorily challenged (18-7, 11-15, 17-5, 17-14, and 12-1) are technically "venire members" rather than "jurors."

Mass. at 352-353. See *Commonwealth* v. *Seabrooks*, 433 Mass. at 445.

Juror 12-1, a parent of two college students, responded that he had heard about this incident in the news and remembered saying to his wife, "I would not want to have a call saying that my child got killed." However, in response to specific questioning by the judge, he denied that he had formed an opinion and answered clearly and affirmatively that he could disregard what he had read or heard and be a fair and impartial juror. Article 12 of the Massachusetts Declaration of Rights and the Sixth Amendment to the United States Constitution, which guarantee the right to an impartial jury, do not require that jurors have no prior knowledge of the alleged crime. *Id.* at 442.

Juror 12-10 was concerned about the impact of jury service on a job that he had held for less than one year, and about his commute from Lowell each day for jury service. The juror expressed concern about being fired, but was informed by the judge that his employer could not fire him in consequence of jury service. The record is clear that his concerns were adequately expressed to, and evaluated and allayed by, the judge.

Juror 17-1, a young student, responded that she knew about the case but did not recall any of the specific facts. The juror also told the judge that she had spoken with a person who either knew about the case or was a potential witness but, upon further inquiry, responded affirmatively that she could remain impartial and unbiased, and that she "could probably be fair" in weighing the evidence. We conclude that the judge explored the grounds for any possible claim of impartiality and determined that this juror stood indifferent. We defer to her determination. See *Commonwealth* v. *Seabrooks*, 433 Mass. at 443.

Juror 17-5 informed the judge that his girlfriend had been raped and assaulted nine years earlier and that he had participated in the prosecution of that case. He stated that he had not formed an opinion about the juvenile's case but that "it might be difficult" for him to be impartial. The judge continued the inquiry and specifically asked if the juror could "render a fair and just verdict based solely on the evidence you hear in this case." The juror replied, "I probably could do that."

Counsel later challenged this juror for cause, expressing

concern about the juror's use of the word "probably." It is reasonably clear that, in denying the challenge, the judge had inquired further about this person's ability to be impartial based on the evidence, and that the juror had answered that he could do so. The judge properly exercised her discretion. A potential juror's use of seemingly equivocal language, such as the word "probably," is not determinative of the juror's ability to be impartial. See *Commonwealth* v. *Wilborne*, 382 Mass. 241, 254 (1981) (no abuse of discretion in empanelling a juror who stated that she "did not think" that her friend's experience as a rape victim would affect her ability to be impartial); *Commonwealth* v. *Ascolillo*, 405 Mass. at 459-460 (no abuse of discretion in empanelling a juror whose final answer was, "[n]o, I don't think so," to judge's inquiry about whether his experience as a police officer and assault victim would make him partial). Further, a judge is not required to excuse a juror or allow challenge for cause simply because the juror reveals a potential bias upon initial questioning. It is proper for the judge to question further in order to clarify whether the juror could be impartial. *Commonwealth* v. *Auguste*, 414 Mass. 51, 57-58 (1992). Our evaluation of the judge's further questioning of this juror as set out in the transcript and on the audiotape revealed the juror's demeanor and voice inflection, along with his affirmative response to impartiality. We conclude that there has been no manifest showing that the juror harbored bias, see *Commonwealth* v. *Seabrooks*, 433 Mass. at 443, 445, and thus, we defer to the trial judge's determination.

Juror 17-14 had family and friends in law enforcement. While portions of the judge's questions are noted in the transcript as "inaudible," the judge's inquiry appears to have been consistent with her prior questioning of earlier jurors regarding impartiality and bias. In particular, in her last question, the judge asked the juror if he could give equal weight to the testimony of civilian witnesses and police officers. The juror responded, "I think I could," which satisfied the judge, who had observed his demeanor and tone. We defer to her discretion. See *Commonwealth* v. *Gittens*, 55 Mass. App. Ct. 148, 150-153 (2002). Contrast *Commonwealth* v. *Auguste, supra* at 53, 58 (judge improperly empanelled several jurors who repeatedly expressed grave misgivings about their abilities to be impartial).

Juror 18-7 informed the judge that he also had friends and relatives in law enforcement and that he was employed as an automobile mechanic for the Waltham police department. The transcript indicates that the judge asked him if he could remain impartial and that he answered, "I imagine I could, yeah." We again conclude that the judge explored the grounds for any possible claim of impartiality and properly determined that this juror stood indifferent. See *Commonwealth* v. *Seabrooks*, 433 Mass. at 443. The judge did not abuse her discretion in denying the challenge. See *Commonwealth* v. *Gittens*, *supra* at 150-153.

Juror 1-11 informed the court that he had previously served as a juror on an "assault to murder" case. When he was asked if it would be difficult for him to sit on another criminal case and remain impartial and unbiased, he responded, "I think it would." Thereafter, the judge questioned the juror further about his knowledge regarding the particular case and whether he had formed an opinion. Both answers are inaudible. The judge then asked three times about his ability to be impartial. First, she asked him whether he could decide the case based on the evidence and not on anything seen or heard outside the courtroom. He replied with an unequivocal "yes." The judge next asked him whether there were "any issues" he had not brought to her attention that would prevent him from being impartial and unbiased. He replied with an unequivocal "no." Finally, she specifically asked him if his past experience as a juror on a similar case would affect his ability to be impartial. Although his response is inaudible, it can be reasonably inferred from the judge's response to his answer ("Okay") that the juror had answered in the negative. As with all the other jurors, the judge addressed this juror's initial uncertainty competently.[5] She recognized the initial indication of possible bias and asked probing questions designed to clarify the juror's position. See *Commonwealth* v. *Auguste*, 414 Mass. at 57-58.

Despite the many inaudible gaps in the reconstructed

[5]We note the importance of a criminal defendant's right, under art. 12 and the Sixth Amendment, to have a trial before an impartial jury. Although we afford a trial judge a large degree of discretion in the jury selection process, we are compelled to emphasize that the judge must be zealous to protect the rights of an accused during empanelment proceedings, and throughout the entire trial process.

transcript, the jury empanelment proceedings, reviewed as a whole, show that the judge followed established procedures and questioned any juror who vacillated in response to questions about bias. The record reveals that many potential jurors were excused, and that the judge was sufficiently thorough.[6] Upon review of the entire record, including the original transcript, the reconstructed transcript, and the audio recordings of the empanelment proceedings, we conclude that an impartial jury rendered the verdicts.

4. *Joint venture instructions.* The juvenile argues that he was deprived of due process under art. 12 of the Massachusetts Declaration of Rights and the Fourteenth Amendment to the United States Constitution because of erroneous jury instructions on an element of joint venture felony-murder. The juvenile argues that the judge improperly instructed the jury that they could find the juvenile delinquent if they found beyond a reasonable doubt that he was armed or was a joint venturer with another who was armed. Relying on *Commonwealth* v. *Watson,* 388 Mass. 536 (1983), *S.C.,* 393 Mass. 297 (1984), the juvenile argues that "the trial court must instruct the jury that it cannot find the defendant guilty of felony murder or the underlying felony unless the Commonwealth proved beyond a reasonable doubt that the defendant knew the accomplice had a weapon." However, the juvenile "apparently forgets . . . that *he was* the principal, according to the Commonwealth's case" (emphasis in original). *Commonwealth* v. *Barnoski,* 418 Mass. 523, 540 (1993). *Watson* involved a defendant who was not the principal, and the court required that, in those circumstances, the Commonwealth must prove beyond a reasonable doubt that the defendant *knew* his accomplice had a weapon.[7] *Commonwealth* v. *Watson,* 388 Mass. at 546.

---

[6]We note that a judge may rely on her customary practice to assist in reconstructing the record. See *Commonwealth* v. *Quinones,* 414 Mass. 423, 432 (1993). An examination of this entire record reveals that the judge's questions to the vacillating jurors were consistent throughout the empanelment proceedings, and addressed the jurors' ability to be unbiased and impartial.

[7]"Of course [the weapon-carrying coventurer], who according to the evidence had a gun and used it, is not entitled to the benefit of the rule we apply to [the non-weapon-carrying joint venturer]." *Commonwealth* v. *Watson,* 388 Mass. at 546-547 n.9.

Indeed, the juvenile's trial counsel virtually conceded that the juvenile possessed the weapon by arguing, "notice I am not arguing to you that [the juvenile] had a right to stab somebody." At trial the juvenile did not challenge the uncontradicted evidence that firmly established that he possessed the knife and used it to fatally stab Raustein. His theory of the case was not that he was unarmed, or that one of his cohorts was carrying the knife, but rather that he did not share the intent to commit the armed robberies, and therefore could not be guilty of felony-murder.

The juvenile apparently proceeded on this theory because all the evidence pointed to the juvenile — and only the juvenile — as the one in possession of the knife at the time of the murder. Fredheim and Velez testified to this fact. Velez also testified to the juvenile's admissions to stabbing Raustein, and the juvenile was the only one of the three assailants to have blood on his hands, pants, and sneakers. Furthermore, only the juvenile's fingerprints were found on the knife. Accordingly, a *Watson* instruction was not required. Contrast *Commonwealth* v. *Claudio*, 418 Mass. 103, 113 (1994) (lack of a *Watson* instruction was prejudicial where the identity of the stabber was disputed at trial).

*Judgments affirmed.*

*Order denying motion for new trial affirmed.*