NOTICE: All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports. If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

17-P-441                                          Appeals Court

COMMONWEALTH  vs.  NJISANE CHAMBERS.

No. 17-P-441.

Suffolk.    March 7, 2018. – August 29, 2018.

Present:  Meade, Rubin, & Neyman, JJ.


Jury and Jurors. Constitutional Law, Jury. Practice, Criminal,
    Jury and jurors, Empanelment of jury, Instructions to jury,
    Mistrial, Disclosure of evidence, Argument by prosecutor.



Indictments found and returned in the Superior Court
Department on November 18, 2014.

The cases were tried before Christopher J. Muse, J.


Rebecca Rose for the defendant.
Kathryn E. Leary, Assistant District Attorney, for the
Commonwealth.


MEADE, J.  After a jury trial, the defendant was convicted

of three counts of assault and battery by means of a dangerous

weapon and carrying a dangerous weapon. After a separate jury

trial, he was convicted of carrying a dangerous weapon as a

second and subsequent offense. On appeal, he claims that the

judge abused his discretion by not dismissing a juror and by denying a motion for a mistrial. The defendant also claims that the prosecutor's opening statement and closing argument were errors that created a substantial risk of a miscarriage of justice. We affirm.

1. Background. On the night of June 6, 2014, off-duty State Police Trooper Peter Bien-Aime; his wife, Leslie Bien-Aime;[1] and another couple, David Lebrun and Elizabeth Almeida, went out for the night in Boston. Sometime after midnight, the group went to Venu (hereinafter, club), a night club located on Warrenton Street.

After getting drinks, Peter and Lebrun were making their way back to Leslie and Almeida, who were conversing when the defendant approached the women. The defendant, a short, skinny, black male with very short hair, wished to dance with Almeida; she had no interest.[2] Upon seeing the two women upset, Lebrun and Peter approached the defendant, who greeted them by throwing a drink at them; the cup hit Peter in his face. Pushing ensued,

---

[1] Given the married couple's identity of surname, we will refer to each by his or her first name.

[2] The defendant was accompanied by another man, who was described as being a tall black male with braids.

which resulted in intervention by Mercelino Amaro, the club manager.  The defendant was escorted out of the club.

Outside the club, Boston police Officer Stephen Fabiano and Detective Kevin Guy, who were working a detail in the theater district, saw the defendant being removed from the club.[3]  They saw him yell at someone in the doorway and try to reenter the club a few times before he and his friend walked away on Warrenton Street in the direction of Stuart Street.

Approximately thirty minutes later, the two couples left the club and began walking up Warrenton Street towards a parking lot where their car was parked.  While they walked, the group was approached by the defendant and the other man Peter had seen earlier in the club.[4]  They asked the group in a sarcastic manner if they were "the guys that were fighting, beating up those two people in [the club]."  The defendant began "violently" waving his hands around and stabbed Lebrun in his lower back.  When

_____

[3] They described the defendant as a short, thinly built, black male.

[4] Peter recognized the two men from the earlier incident in the club.  At first, Leslie and Lebrun did not recognize the two men from the earlier incident.  Lebrun had not recognized the defendant at first because he had on a leather jacket when he approached them in the street.  As the two men approached, Almeida did not recognize them from the earlier incident in the club.  However, her physical description of the defendant, a short, skinny, black male, was consistent with her description of the man who threw the drink in the club.

Almeida screamed "what are you doing," the defendant grabbed her arm, spun her around, and stabbed her in the upper left back, next to her lungs, ribs, and spine. Almeida immediately fell to the ground, and Leslie began screaming. The defendant then swung at Peter and stabbed him just below his belt, piercing his clothing. When the defendant attempted to flee, Peter tackled him.

Officer Fabiano and Detective Guy saw the fight occurring from their position up the street. They recognized both Peter and the defendant, who was one of the men who had been removed from the club. The officers separated Peter and the defendant, who had been rolling on the ground and fighting. The defendant struggled to get away, but Guy pinned him against a nearby parked bus. Amaro, who followed the police down the street, also recognized the group from the earlier drink-throwing incident. As the defendant was pinned against the bus, Amaro saw a knife fall to the ground between Guy and the defendant, and Amaro secured it by stepping over it (to block its use).

After the fight, Lebrun identified the defendant as the person who stabbed them, and the defendant was arrested. Peter also was arrested and transported to the police station where he was later released.

2. <u>Discussion</u>. a. <u>Jury selection</u>. <u>Juror number (no.) twelve's fears and concerns</u>. The defendant claims that he was

denied his right to an impartial jury because the judge abused his discretion when he declined to dismiss juror no. twelve, who expressed a concern about his ability to be impartial due to the stress of missing college classes. We disagree.

The Sixth Amendment to the United States Constitution and art. 12 of the Declaration of Rights of the Massachusetts Constitution guarantee criminal defendants trial by an impartial jury. See Skilling v. United States, 561 U.S. 358, 377 (2010); Commonwealth v. McCowen, 458 Mass. 461, 494 (2010). "We afford a trial judge a large degree of discretion in the jury selection process." Commonwealth v. Vann Long, 419 Mass. 798, 803 (1995). See G. L. c. 234A, § 39. The judge is duty bound to question potential jurors to ferret out any possible bias, prejudice, partiality, or whether there exists a substantial risk that the potential juror may be influenced by factors extraneous to the evidence at trial. Commonwealth v. Andrade, 468 Mass. 543, 547 (2014). When evaluating juror impartiality, it is sufficient for the judge to inquire whether potential jurors can set aside their own opinions, properly weigh the evidence, and follow the judge's instructions. Id. at 547-548. See Commonwealth v. Perez, 460 Mass. 683, 688-689 (2011). "[A] determination by the judge that a jury are impartial will not be overturned on appeal in the absence of a clear showing of abuse of discretion or that the finding was clearly erroneous." Commonwealth v. Andrade,

supra at 548, quoting from Commonwealth v. Lopes, 440 Mass. 731, 736 (2004). See Commonwealth v. Ferguson, 425 Mass. 349, 352-353 (1997) (determination of juror impartiality "is essentially one of credibility"); Commonwealth v. Emerson, 430 Mass. 378, 384 (1999) ("A finding that a juror is impartial will not be overturned on appeal unless the defendant makes a clear showing of abuse of discretion or that the finding was clearly erroneous").

The judge conducted the empanelment process and asked the prospective jurors questions along the lines prescribed by G. L. c. 234, § 28.[5] During this process, the judge inquired whether juror no. twelve had raised his hand to any of the questions. The juror indicated that he had done so in response to the judge's question regarding whether the length of the trial would be a burden. The juror explained that he was a student at Northeastern University (university) and that serving as a juror would "significantly impact" his course work. The judge informed the juror that he would not excuse him for that reason, and that the university would support his service as a juror. Juror no. twelve agreed and had no other questions. Neither party exercised any form of challenge to the juror.

---

[5] General Laws c. 234, § 28, was repealed after the defendant's trial. See St. 2016, c. 36, § 1. For the current applicable statute, see G. L. c. 234A, § 67A.

At the end of the first day of trial, juror no. twelve sent the judge a note stating, "I believe that the stress of missing school will result in an impartial [sic] decision on my part.  I am terrified that I will fail my classes and do not know if I can make a fair decision in the near future."  The judge was understandably troubled by the note and questioned juror no. twelve at sidebar.  The judge explained that jury service by college students in the Boston area was in no way unique and that it was a great opportunity to be given such a responsibility as a young adult.  He told the juror that many other students have had the same concerns and that the universities are required to make accommodations for jury service.  The juror understood, but he remained concerned about missing classes and having to make up the work.  The judge understood the juror's concerns, wanted him to be "comfortable" with his jury service, and instructed him to speak to university officials about what accommodations they would make for him and to report back to the judge the next day.  The juror agreed, noted that he had already contacted the registrar's office, and told the judge that he "definitely want[ed] to participate in [his] civic duty," but remained concerned.  After reassuring the juror that the university would permit him to make up the work he missed, the juror agreed to do as the judge requested.

The next morning, after the judge confirmed with juror no. twelve that the university would make accommodations for his jury service, the judge nevertheless inquired whether the juror could be fair to the defendant and give his attention to the judge's instructions and the evidence. The juror responded, "I would definitely do my best, but I can't promise anything." On further inquiry, the juror explained that he feared falling behind in his class work, but then indicated that he would "man up" and do his best.

At the conclusion of the colloquy, the judge told the juror he was "a perfect candidate" to make sure the right result was reached, to which the juror responded, "I simply don't know." The judge decided to continue with the trial and to keep the juror seated. Defense counsel requested that the juror be struck for cause. The judge explained that he would "keep [him] as a work in progress, and assured counsel that he would not keep the juror for deliberation if "he's impaired."

"As a general principle, it is an abuse of discretion to empanel a juror who will not state unequivocally that he or she will be impartial." Commonwealth v. Colton, 477 Mass. 1, 17 (2017). However, evaluating a juror's use of seemingly equivocal language to make that determination lies within the judge's discretion. Here, in response to the judge's questions, the juror said he would do his "best" but could not "promise

anything."  The judge reasonably could have concluded that these responses merely reflected the juror's habits of speech, contrast Commonwealth v. Vann Long, 419 Mass. at 804 & n.5 ("statements that [the juror] 'would hope' he could be fair to the Cambodian defendant were not habits of speech, but indications of ethnic bias"), or were, at bottom, "not determinative of the juror's ability to be impartial." Commonwealth v. Jaime J., 56 Mass. App. Ct. 268, 274 (2002). See Commonwealth v. Prunty, 462 Mass. 295, 302 (2012) (no abuse of discretion to retain African-American juror who stated he "would be able to do my best" to not let defendant's racial prejudice affect juror's ability to be impartial); Commonwealth v. Colton, supra (no abuse of discretion to empanel juror who, when asked if she could be fair to both sides, responded, "Yes, I think so," which "could be viewed as unequivocal").[6]  See also

---

[6] In Commonwealth v. Colton, supra, the Supreme Judicial Court cited Commonwealth v. Vann Long, 419 Mass. at 804, in support of the general principle that jurors need to be unequivocally impartial.  In Vann Long, where a juror expressed that he "would really hope" that he could be fair to the Cambodian defendant, the court held that the judge abused his discretion by seating that juror, who harbored an ethnic bias against Cambodians.  Ibid.  Of course, nothing of the kind appears on this record.  In fact, more in line with this case, is another response from the juror in Vann Long, where he indicated that because his mother suffered from terminal breast cancer, he was "afraid [he] would be a little impatient here, especially with the deliberations.  I will want to get out of here."  Id. at 799.  As in this case, the judge did not treat

Commonwealth v. Wilborne, 382 Mass. 241, 254 (1981) (no abuse of discretion in empanelling juror who stated that she "did not think" that her friend's experience as rape victim would affect juror's ability to be impartial); Commonwealth v. Ascolillo, 405 Mass. 456, 459 (1989) (no abuse of discretion in empanelling juror whose final answer was, "No, I don't think so," to judge's inquiry whether juror's experience as police officer and assault victim would make him partial).  Also, that juror no. twelve expressed some uncertainty with the judge's assessment of the juror being a perfect candidate for jury service did not require the judge to find that uncertainty to be an indicator of partiality any more than humility.

Unlike this court's review of the cold record, the judge was uniquely situated to measure juror no. twelve's demeanor and credibility.  Although early on in the judge's inquiry, the juror stated his concern about his ability to be "impartial," the judge did not end the matter there.  Instead, he conducted a careful and thorough examination of the matter, after which the judge was in a better position to evaluate and to credit (or discredit) the motivation and the effect of the juror's stated concerns.  Compare Commonwealth v. Auguste, 414 Mass. 51, 57

---

the juror's expression of frustration with the length of the trial as an indicator of partiality.

(1992) (finding abuse of discretion where judge's inquiry "avoided the very issue" of juror's ability to be impartial and coerced juror's responses). Our review of the record supports the judge's apparent determination that the juror's "doubts about his . . . own impartiality [were] unfounded," id. at 58, and were not an indicator of partiality at all. While the juror classified his stress and concern about falling behind in his class work under the label of partiality, the judge was not required to credit what the juror reported. See Commonwealth v. Ferguson, 425 Mass. at 352-353. However, even if the judge did credit the juror's scholastic concerns, those concerns are not a basis to discharge a juror. As we held in Commonwealth v. Campbell, 51 Mass. App. Ct. 479, 483-484 (2001), "A juror's complaints about the length of the proceedings, or expressions of frustration about having to serve as a juror, do not necessarily reflect the juror's inability to perform his or her function as an impartial trier of fact and, therefore, it is properly within the trial judge's discretion to refuse to discharge such a juror." See Commonwealth v. Mabey, 299 Mass. 96, 99 (1937) (no indication that jury were unable or unwilling to give full and careful consideration to evidence in spite of foreperson's statements that jury were beginning to "get kind of jumpy" and that "[w]e [the jury] are just dying to get out").

Indeed, at its core, this juror's concerns centered on his frustration about the inconvenience inherent in performing jury service. It did not reflect partiality or bias such that retaining him constituted reversible error. See Commonwealth v. Campbell, supra at 483, citing Commonwealth v. Vann Long, supra at 804 & n.5. Instead, juror no. twelve's concern about missing his classes was a "run-of-the mill frustration[] by an exasperated juror about the judicial process," which is "to be expected." Commonwealth v. Campbell, supra at 484. Notably, after the judge's thorough colloquy, the juror never again raised his concerns regarding his stress from the length of the trial and its impact on his course load. Indeed, in his written findings,[7] the judge wrote that when juror no. twelve returned to the trial (after having conferred with the university), the juror was "satisfied that he could continue with his service. The [judge] found that there was no reason to discharge him." Fairly read, the judge concluded that the juror could perform his function impartially. Given these findings, the judge's

---

[7] Prior to deliberations, the judge denied a motion from both parties to dismiss juror no. twelve. The Commonwealth also filed a petition pursuant to G. L. c. 211, § 3, seeking the discharge of juror no. twelve. In response, the judge filed written findings, which the defendant does not challenge, explaining his denial of the motion to discharge the juror. A single justice of the Supreme Judicial Court denied the Commonwealth's petition.

decision to retain the juror was not an abuse of discretion where the judge could properly conclude that he had allayed the juror's school work concerns so that the juror could render an impartial verdict based on the evidence.  See Commonwealth v. Ferguson, supra; Commonwealth v. Colton, 477 Mass. at 16-17.  In other words, even though it might have been our choice in the first instance to have excused this juror, it falls outside our appellate office to substitute our judgment for the judge, who conducted the colloquies, assessed the juror's demeanor, and subsequently credited the juror's statements as being unequivocal.[8]  See Commonwealth v. Ferguson, supra at 352-354. The decision the judge made was neither a "clear error of judgment," nor did his "decision fall[] outside the range of reasonable alternatives."  L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014) (citation omitted).

Juror no. twelve's opinion of the law.  The defendant also claims that juror no. twelve should have been dismissed after he spoke of jury nullification and expressed his disagreement with a point of law from the judge's instructions.  We disagree.

---

[8] The dissent maintains that "[t]he judge is required to ask them if they can be [fair and impartial], and to take them at their word" (emphasis supplied).  Post at        .  This "rule," advanced without support, would strip the judge of any discretion to assess a juror's credibility and would relegate our appellate role to simply determining whether all of the "magic words" had been spoken in the colloquy.

After the judge completed his instructions to the jury, but before deliberations began, juror no. twelve sent a note to the judge stating, "I believe I may know information that would affect my ability to judge the case based solely on the information received in the trial." When questioned by the judge, the juror clarified that he had not been exposed to extraneous evidence, but that he had "heard about how the jury actually has more power than [the judge] expressed, that [the jury] can judge not only based on just information, but whether they believe the law is fair, or their personal convictions . . . to judge guilty or not guilty." The judge explained that this was known as jury nullification, and that it was not permitted. The judge further explained that although he cannot instruct the juror on how to deliberate, he told the juror that the jury determine what the facts are, and that the jury must accept the judge's statement of the law regardless of the jury's agreement with it. The judge queried whether juror no. twelve had any question regarding his ability "to take the law as I gave it to you, and apply it to the facts as you and [the] other jurors find them?" The juror responded, "I don't think so." Sensing some hesitancy, the judge again explained the two different roles performed by the judge and the jury, and reiterated his instructions on the elements of the charged offenses.

Although agreeing with much of what the judge explained, juror no. twelve stated that he did not believe it should be unlawful to possess a small knife.  The judge further explained that it was not just that the knife's blade must be more than one-and-one-half inches, but that the knife must also have a case that enables the knife to be drawn in a locked position.  See G. L. c. 269, § 10(b).  After this explanation, the judge asked the juror if he had any problem applying that law, to which the juror said, "I guess not."  Not satisfied with the juror's response, and sensing that the juror may nevertheless disagree with the law, the judge further instructed that the juror had to apply the law even if he disagreed with it.  The juror responded that he "thought that the jury had the power to choose whatever way to --," whereupon the judge interrupted and said, "I just told you it doesn't."  The juror said, "Okay."

The judge continued to explain the importance of the jury understanding their obligations and that there should not be any hesitancy.[9]  The judge then asked if the juror was able to apply

---

[9] The juror asked if there was "punishment if the jury does not --"  The judge interrupted, believing that the juror was concerned about punishment of the defendant, and told the juror not to worry about punishment and to only judge the facts.  The juror indicated his understanding by saying, "Okay."  Contrary to the dissent's suggestion, the judge did not tell the juror that he would be punished if he engaged in jury nullification.  See post at        .

the law to the elements as the judge explained, and juror replied, "Yes." The judge then painstakingly went through his other "major" jury instructions to ascertain whether the juror had any problem applying those instructions, and juror said he had no problem. Finally, the judge asked, in reference to jury nullification, whether the juror was able to forget about "what other people have told [him]." The juror agreed that he could, and that he could be fair and honest to his oath. When the judge asked if the juror was "all set," the juror replied that he was and thanked the judge for speaking with him. The judge thanked the juror and shared his appreciation for the juror having the courage to speak up and resolve his concerns.[10]

At the close of this colloquy, defense counsel renewed his request that the juror be discharged, and the prosecutor joined the request. In response, the judge explained to both counsel how the juror's concerns were resolved, that the juror would put aside his personal beliefs, would not engage in jury nullification, and was able to serve dispassionately with full

---

[10] Given this ending to the colloquy, we have difficulty crediting the defendant's characterization of the judge's colloquy as an "interrogation," or that it was "coercive." Rather, the judge never dropped his proper neutral role, and went to great lengths to resolve the juror's concerns and misconceptions. Equally unavailing is the dissent's claim that when the judge asked the juror if the juror could apply the law as the judge instructed, "[Y]es" was the only answer the judge would accept. See post at        .

attention to the case.  The judge explained that he "went to great pains to give [the juror the] security of being able to be a juror as well as a student, . . . and [the judge did not] find any reason to discharge [the juror] after the colloquy that [they] engaged in."  Counsels' objections were noted.

Contrary to the defendant's claim, the juror did not continually express his inability to be impartial and to apply the law as given.  As the juror admitted, he was not exposed to any extraneous information.  Instead, and apparently, the juror had been apprised of the concept of jury nullification.  The judge properly explained that jury nullification was not permitted and would be a violation of his oath to apply the law as given.  See Commonwealth v. Kirwan, 448 Mass. 304, 319 (2007) ("Jury nullification is inconsistent with a jury's duty to return a guilty verdict of the highest crime proved beyond a reasonable doubt").  See also Commonwealth v. Paulding, 438 Mass. 1, 9 (2002) (jury may not "exercise clemency"; their verdict may not be "contrary to the facts or the law of the case," and that verdict may not be an effort "to control the punishment which they think should be imposed on the defendant for his crime"), quoting from Commonwealth v. Dickerson, 372 Mass. 783, 812 (1977) (Quirico, J., concurring).  Cf. art. 30 of

the Massachusetts Declaration of Rights (Commonwealth is "a government of laws and not of men").[11]

When juror no. twelve told the judge that he did not agree with the law regarding the knife as a dangerous weapon, the judge first discussed the issue with the juror and clarified what the law was. After this explanation, the judge asked the juror if he had any problem applying that law, to which the juror said, "I guess not." Not satisfied, the judge asked additional questions, which culminated in the juror agreeing that he would be able to apply the law to the elements as the judge explained. As an added measure of caution, the judge returned to other major portions of his instructions to ascertain the juror's proper understanding of his role.

Contrary to the defendant's claim, the judge addressed the juror's "initial uncertainty competently" by "ask[ing] probing questions designed to clarify the juror's position." Commonwealth v. Jaime J., 56 Mass. App. Ct. at 275. Based on the juror's response that he could apply the law as instructed, the judge did not abuse his discretion in crediting the juror's response and declining to discharge the juror. "We defer to the judge's conclusion not to excuse this juror, because he had the

---

[11] To the extent the dissent claims that it would be erroneous to instruct a jury that they lacked the power to nullify a verdict, see post at          , the defendant makes no such claim and the matter is not before us.

opportunity to observe [the juror's] demeanor while he questioned [the juror] at some length, and because [the juror's] answers to his probing questions allayed any concerns he might have had."  Commonwealth v. Seabrooks, 433 Mass. 439, 443-444 (2001).[12]  The judge was within his discretion to decline to dismiss juror no. twelve.[13]

b.  Late disclosed discovery.  After the second day of trial, the Commonwealth disclosed eighty-five crime scene photographs and an eighteen-page crime scene response report with diagrams showing the location of the knife.  In response, the defendant requested a mistrial on the ground that the prejudice to the defense was too great to overcome because

_____

[12] In his written findings, see n.7 supra, the judge expressly found that the juror "indicated to the satisfaction of this judge that he would apply the law."

[13] The defendant properly acknowledges that it is improper for a juror to disregard the law as given by the judge, but claims that the judge should have instructed the juror that it remained within his power to "vote his conscience."  However, the defendant never requested that the judge so instruct, and has failed to identify any authority that would have required the judge to have done so sua sponte.  Pursuing the matter from an angle not raised by the defendant, the dissent claims that "it also cannot be permissible to instruct a juror falsely that he or she lacks the power to vote his or her conscience."  Post at    .  Given that the defendant makes no such claim, and that the judge did not so instruct, the matter is not before us.  However, it is worth noting that the judge explained to the juror that he (the judge) cannot instruct the juror on how to deliberate, and that the jury had the power to determine what the facts are.

defense counsel would have altered his trial strategy and tactics if the evidence had been timely disclosed.  The judge denied the motion.

On appeal, the defendant claims that the judge abused his discretion by denying the request for a mistrial because the late disclosure of the evidence compromised his prepared defense, which he already had been pursuing in his opening statement and through cross-examination of witnesses who already had been dismissed.  We disagree.

"We review the denial of a motion for a mistrial for abuse of discretion."  Commonwealth v. Martinez, 476 Mass. 186, 197 (2017), citing Commonwealth v. Lao, 460 Mass. 12, 19 (2011). "The trial judge is in the best position to assess any potential prejudice and, where possible, to tailor an appropriate remedy short of declaring a mistrial."  Commonwealth v. Martinez, supra.  See Commonwealth v. Amran, 471 Mass. 354, 360 (2015). "[T]he burden of demonstrating an abuse of discretion is a heavy one."  Commonwealth v. Medeiros, 395 Mass. 336, 351 (1985).

The question, when dealing with the delayed disclosure of exculpatory or inculpatory evidence,[14] is "whether, given a

---

[14] The "distinction between inculpatory and exculpatory evidence is not significant where the issue is delayed disclosure, as opposed to failure to disclose."  Commonwealth v. Baldwin, 385 Mass. 165, 175 n.10 (1982).

timely disclosure, the defense would have been able to prepare and present its case in such a manner as to create a reasonable doubt that would not otherwise have existed." Commonwealth v. Baldwin, 385 Mass. 165, 175 (1982), quoting from Commonwealth v. Wilson, 381 Mass. 90, 114 (1980).

> "Absent a showing of bad faith, we consider the primary issue of prejudice. In measuring prejudice, 'it is the consequences of the delay that matter, not the likely impact of the nondisclosed evidence, and we ask whether the prosecution's disclosure was sufficiently timely to allow the defendant "to make effective use of the evidence in preparing and presenting his case."'"[15]

Commonwealth v. Stote, 433 Mass. 19, 23 (2000), quoting from Commonwealth v. Wilson, supra. See Commonwealth v. Nolin, 448 Mass. 207, 224 (2007).

After hearing arguments on the motion for a mistrial, the judge took the matter under advisement and gave the defendant four days to digest the new evidence and to determine how he would proceed.[16] The judge also ordered a copy of the transcript of defense counsel's opening statement so the judge could determine whether counsel had made any promises he could no longer keep in light of the new evidence. When the trial

---

[15] The parties agree that the prosecutor exercised no bad faith in the late disclosure of the report and the photographs.

[16] The motion was made on a Thursday morning and Friday was a scheduled day off, so defense counsel had until Monday morning to review the new evidence.

resumed, the judge denied the request for a mistrial.  He held that counsel had made no promise he could not keep, and the judge ordered the Commonwealth to make the witnesses who had already testified available in the event that the defendant wished to recall them.

There was no abuse of discretion for several reasons.  As the judge noted, the photographs and the diagrams in the eighteen-page report were neither exculpatory nor exceptionally probative to either party's case.  The judge even offered to exclude the evidence, if the defendant so chose.  Also, as the judge noted, although there were eighty-five crime scene photographs, they appeared to him to be cumulative and repetitive of other crime scene evidence; all were taken in the same general areas.

There is no merit to the defendant's claim that the late disclosed evidence changed the blocking of the crime scene.  Nor did the new evidence depict the area as more "complicated" than described by the Commonwealth's witnesses in a manner that weakened the Commonwealth's case.  In fact, the photographs and the diagrams corroborated the witnesses' testimony that Detective Guy pulled the defendant and Peter away from each other and pinned the defendant up against a parked bus, and that the knife fell to the ground near the bus during the struggle between Detective Guy, the defendant, and Peter.

In view of the continuance, the delayed disclosure cannot be said to have forced the defense to change any tactics that already had been in place.  The defense was that the police investigation was inadequate.  See Commonwealth v. Bowden, 379 Mass. 472, 485-486 (1980).  The gravamen of the defense was that the police conducted a subpar investigation because they were biased and had chosen sides because one of the victims was an off-duty State trooper.  The crime scene photographs and the diagrams would have added little to this argument.  Also, it was understood by all parties that the Commonwealth would not introduce the photographs or any portion of the crime scene report.  Given the remedies applied and the lack of prejudice to the defendant, there was no error or abuse of discretion in the denial of the request for a mistrial.  See Commonwealth v. Costello, 392 Mass. 393, 399-400 (1984); Commonwealth v. Hamilton, 426 Mass. 67, 70-71 (1997).

c.  Prosecutor's opening statement and closing argument. Finally, the defendant claims that the prosecutor made a series of improper remarks during her opening statement and closing argument that created a substantial risk of a miscarriage of justice.  We disagree.

Opening statement.  "The proper function of an opening is to outline in a general way the nature of the case which the counsel expects to be able to prove or support by evidence."

Commonwealth v. Staines, 441 Mass. 521, 535 (2004) (citation omitted).  See Commonwealth v. Lodge, 89 Mass. App. Ct. 415, 417 (2016).  Here, the defendant takes issue with the prosecutor's statement that "[w]e are here today because the defendant, Mr. Njisane Chambers, doesn't handle rejection well.  He can't let things go."  The prosecutor repeated this theme in other portions of her opening statement.[17]

Contrary to the defendant's claim, when viewed in light of the entire opening, these statements do not amount to improper argument, but rather were a proper outline of the general nature of the case and gave context to the defendant's stabbing of the victims.  See Commonwealth v. Tarjick, 87 Mass. App. Ct. 374, 381 (2015) (prosecutor may "place in context the evidence that the Commonwealth reasonably expected to produce at trial").  The prosecutor's statements were made in the context of the anticipated evidence regarding Almeida's rejection of the defendant's advances in the club and the defendant's reaction to that rejection by throwing a drink as well as by attacking the group with a knife after they left the club.  There was no error, and thus no risk that justice miscarried.

---

[17] The prosecutor told the jury that "[h]e waited.  He waited outside as the minutes ticked by, and his anger built up more and more"; he "can't let things go.  He doesn't handle rejection well"; and "his anger built up like a ticking time bomb."

The defendant also finds impropriety in the prosecutor's statement that James Feeney, who was in a band tour bus parked on Warrenton Street at the time of the stabbing, would testify "that it was the defendant, Mr. Chambers, [who] stabbed these three individuals in the street . . . and it was the defendant and the defendant alone who is responsible for these actions." This the defendant claims was improper because Feeney did not make an out-of-court identification. We disagree.

In general, "a prosecutor in a criminal action may state anything in [her] opening argument that [she] expects to be able to prove by evidence. . . . This general rule also permits the prosecutor to state those facts which would have to be proved by inferences." Commonwealth v. Smith, 58 Mass. App. Ct. 166, 175 (2003). Here, Feeney testified that he saw a smaller black male push a woman to the ground and attempt to run away before being tackled to the ground by a tall, muscular black male, and that the bigger male was on top of the smaller male when the police arrived. Also, both Officer Fabiano and Detective Guy testified that Peter was pinning the defendant down when they arrived. Based on the descriptions of the scene and the defendant, the prosecutor's statement was a fair inference from the evidence. To the extent there was any misstep, the judge instructed the jury that opening statements are not intended to persuade them,

but only to offer an outline of what the expected evidence will be.  See Commonwealth v. Simpson, 434 Mass. 570, 584 (2001).

Closing argument.  Finally, the defendant claims that the prosecutor argued facts not in evidence and engaged in burden shifting.  The defendant did not object to the prosecutor's closing argument and, therefore, we review for error and, if any, whether it created a substantial risk of a miscarriage of justice.  See Commonwealth v. Coutu, 88 Mass. App. Ct. 686, 697 (2015).

The defendant claims that the prosecutor misstated the evidence when she argued that "not only [Peter], but all of the victims gave statements.  Mercelino Amaro gave statements.  Jim Feeney, never met these people in his life, he gave a statement.  And who did they all say was responsible?  The defendant."  The defendant offers, however, that this was false because only Peter and Lebrun identified the defendant.  We disagree.  The argument was properly based on the reasonable inferences from the evidence.  Amaro, Feeney, and Almeida each described the defendant by his physical appearance in a consistent manner, i.e., that he was a short, slim, black male with short hair.  This physical description of the assailant matched the defendant, who Peter and Lebrun identified as the same person from the earlier altercation in the club.  Although Almeida, Feeney, and Amaro, did not directly make out-of-court or in-

court identifications of the defendant, the prosecutor properly suggested, based on the circumstantial evidence and reasonable inferences therefrom, that the person they described as the perpetrator was the defendant. See Commonwealth v. Deane, 458 Mass. 43, 55-56 (2010) ("A prosecutor is entitled to argue the evidence and fair inferences to be drawn therefrom" [quotation omitted]). There was no error and, thus, no risk that justice miscarried.

The defendant also claims that the prosecutor engaged in impermissible burden shifting when she argued, regarding the deoxyribonucleic acid (DNA) evidence: "The DNA doesn't tell us why, and defense counsel is only focusing on the police, the police failures, the DNA, because that's all he has to hang his hat on, because he has no reasonable explanation, no rational explanation for the actions of the defendant." This, the defendant argues, signaled to the jury that the defendant had an affirmative duty to bring forth evidence of innocence.

However, as the Commonwealth maintains, the argument should be understood to be a comment on the weakness of the defendant's case and the trial tactic of highlighting the prosecution's failure to test the blood on the knife for DNA. See Commonwealth v. Feroli, 407 Mass. 405, 409 (1990); Commonwealth v. Buzzell, 53 Mass. App. Ct. 362, 367-368 (2001). In fact, in the defendant's closing, in support of his Bowden defense,

counsel highlighted that because the knife had not been tested for DNA, it was unknown whether the knife had a mixture of DNA on it or whether it may have had only the defendant's DNA on it, and how the latter would have damaged the Commonwealth's case. The prosecutor was entitled to "comment on the trial tactics of the defence," Commonwealth v. Grimshaw, 412 Mass. 505, 507 (1992), and to respond to the defendant's closing argument.  See Commonwealth v. Smith, 404 Mass. 1, 7 (1989).  See also Commonwealth v. Feroli, supra ("A prosecutor is entitled to emphasize the strong points of the Commonwealth's case and the weaknesses of the defendant's case, even though he may, in so doing, prompt some collateral or passing reflection on the fact that the defendant declined to testify"); Commonwealth v. Cohen, 412 Mass. 375, 388 (1992) ("It is . . . not improper for a prosecutor to comment on a defendant's attempt to confuse or distract the jury by diverting their attention from the strong evidence of the defendant's guilt").

However, even if the prosecutor's argument was improper, we conclude that it did not create a substantial risk of a miscarriage of justice.  Several components of the case lead to this conclusion.  See Commonwealth v. Randolph, 438 Mass. 290, 297 (2002).  First, there was no objection to the statements, which lends credence to the belief that they did not create an unfair or prejudicial impact.  See Commonwealth v. Lyons, 426

Mass. 466, 471 (1998).  Second, the Commonwealth's case was particularly strong.  The defendant was identified and detained at the scene of the stabbing after his attack on the victims with whom he had earlier fought inside the club.  Third, the judge instructed the jury on the limited purpose of closing arguments and, more importantly, that the Commonwealth bore the burden of proof and that "the defendant in a criminal case never has any duty or obligation to testify or to come forward with any evidence."[18]

Judgments affirmed.

---

[18] Given our resolution of the appeal, there is no need to address the defendant's argument relative to cumulative error.

RUBIN, J., dissenting. This is a straightforward case. Both the public and the defendant are entitled to fair and impartial jurors, and the requirement of fairness and impartiality includes the ability to attend to and fairly to consider the evidence and the judge's instructions. See Commonwealth v. Sleeper, 435 Mass. 581, 589 (2002) ("Both the Commonwealth and the defendant are entitled to an attentive jury"). Therefore, as the Supreme Judicial Court reminded us during the pendency of this very appeal, "As a general principle, it is an abuse of discretion to empanel a juror who will not state unequivocally that he or she will be impartial." Commonwealth v. Colton, 477 Mass. 1, 17 (2017).

Juror number (no.) twelve would not, and did not, make any such statement. Indeed, the majority does not attempt to identify a single statement of the juror in which he said he could be fair and impartial. The very closest the juror came to that was to say, "I would definitely do my best, but I can't promise anything," which, as a matter of law, does not amount to the required unequivocal statement. The Supreme Judicial Court has already held that a juror's statement that "he would 'do [his] best'" is not an "unequivocal[] state[ment] that [the juror] would be impartial," and that it does not suffice to permit a juror to sit whose impartiality is in question. Commonwealth v. Vann Long, 419 Mass. 798, 804 (1995). Juror no.

twelve's "I can't promise anything" addendum only weakens his statement.

In fact, far from unequivocally stating that he would be fair and impartial, juror no. twelve stated unequivocally that he believed that he could <u>not</u> be fair and impartial in this matter, and never subsequently stated unequivocally that he could or would be fair or impartial or, indeed, that he could listen and attend to the evidence and the instructions.  He never even said that he thought he could.  It was, therefore, an abuse of discretion to seat him.

During trial, both parties moved that he be discharged because of his statements.  Though the Commonwealth here attempts to defend its favorable verdict, in the trial court it went so far as to seek emergency interlocutory relief before the single justice of the Supreme Judicial Court from the refusal of the trial judge to discharge juror no. twelve.

The law is clear that no one in this Commonwealth should be required to stand trial before a juror like this who cannot unequivocally say he will fairly and impartially judge the case before him.  Rather than identifying any purportedly unequivocal statement by the juror, the majority first suggests -- incorrectly in light of <u>Vann Long</u> -- that a judge has discretion to find a juror who says he cannot be fair or impartial nonetheless can be.  More fundamentally though, and more

troubling because the judge never made any such finding about this juror, the majority, in order to affirm the judgments, announces without support that where a juror cannot be fair and impartial because of "frustration about the inconvenience inherent in performing jury service," he or she may nonetheless be seated. Ante at          .

But there are no kinds of unfairness or partiality that are tolerable in a juror. Because I think the judgments therefore should be reversed, I must respectfully dissent.

A. The first and second days of trial. 1. Facts. At the end of the first day of trial, juror no. twelve, an undergraduate student only six weeks into his freshman year at Northeastern University (university), sent the judge a note that said, "I believe that the stress of missing school will result in an impartial [sic] decision on my part. I am terrified that I will fail my classes and do not know if I can make a fair decision in the near future." This was a statement that juror no. twelve did not believe that he could be fair and impartial.

At a sidebar conference, the judge encouraged the juror, and told him that the university would make accommodations for jury service. The judge instructed the juror to speak to university officials about what accommodations they would make for him, and to report back. The next morning, in response to questions from the judge that reflected the judge's clear

understanding of the issue, "Are you going to be able to give me attention, are you going to be able to be fair to this guy and this woman in their respective cases?  Are you going to be able to listen attentively to my instructions?  Are you going to be able to listen to the evidence?" juror no. twelve said only, "I would definitely do my best, but I can't promise anything."

The judge did not respect that answer but said, among other things, "People have to step up to the plate."  The juror responded, "I agree that you're telling me to man up, and I will."

The judge, presumably recognizing the impropriety of shaming the juror into giving what the juror perceived as the judge's desired response, immediately said, "I'm not saying man up.  I didn't say that."  See Commonwealth v. Auguste, 414 Mass. 51, 58 (1992) (judge may probe impartiality with questions, but may not seat juror on basis of "answers suggested or, in fact, required by the questions. . . .  Jurors should not be coerced into a particular response").  The judge then told juror no. twelve, "[Y]ou're almost a perfect candidate for being able to use your analytical skills to be able to listen to the evidence and . . . factor in . . . where the evidence lead[s] you to . . . .  You're a perfect candidate to be able to help out the Commonwealth and the defendant to make sure that their result is reached."  The juror responded, "I simply don't know."

The defendant moved to discharge the juror, and his motion was denied. Although the Commonwealth did not move at this point to discharge the juror, it did at the end of trial in part "based on what he said from Day 1 that he couldn't be impartial after the opening statements and hearing from the first witness." Indeed, the Commonwealth sought emergency interlocutory relief in the Supreme Judicial Court from the order denying this motion.

2. Analysis. "As a general principle, it is an abuse of discretion to empanel a juror who will not state unequivocally that he or she will be impartial." Colton, 477 Mass. at 17. As these facts describe, juror no. twelve stated unequivocally that he believed that the stress of missing school would render him partial, and that terror at the prospect of failing his classes would compromise his ability to be fair. In response to the judge's questions, this juror would not state unequivocally that he could be fair or impartial or that he could be attentive and listen to the evidence and the judge's instructions. He did not even say that he thought he could. His strongest statement, "I would definitely do my best, but I can't promise anything," is inadequate. In Vann Long, 419 Mass. at 804, the Supreme Judicial Court held that as a matter of law, "[I will] do [my] best" is not the requisite "unequivocal[] state[ment] that [the juror] would be impartial." Consequently, it cannot suffice to

permit a juror to sit whose impartiality is in question.  Ibid.
See Commonwealth v. Prunty, 462 Mass. 295, 312 (2012).  The
cases put forward by the majority in which no abuse of
discretion was found in seating a juror who put forth some
version of "I think I could," are therefore irrelevant.  Ante
at      .

Nor is Prunty, the first case cited in the majority list,
ante at        , which the majority describes as finding "no
abuse of discretion to retain African-American juror who stated
he 'would be able to do my best' to not let defendant's racial
prejudice affect juror's ability to be impartial," of any
relevance here.  As the court there explained, Prunty did not
alter the rule articulated in Vann Long that a statement that "I
will do my best" is an insufficiently unequivocal statement of
an ability to be fair and impartial.  Prunty, supra at 311-312.
The statement in Prunty was made by an African-American juror
who had already expressed unequivocally that he could be
impartial and with respect to whom there was no reason to
question whether he could be fair and impartial.  Ibid.  The
juror made the statement when called back for further voir dire
after defense counsel, whose client had made several highly
offensive racist comments that were expected to be introduced at
trial, attempted to utilize a peremptory challenge to strike the
juror and the judge concluded that a prima facie showing had

been made that it was based on the juror's race. Ibid. Defense counsel then alleged without any basis that his client's comments "certainly are going to perhaps get under the skin of somebody who might be a little bit more sensitive to that issue, particularly where that is their descent." Id. at 300. There was no evidence that the juror harbored any racial prejudice and, as the court explained, the rule of Vann Long was not applicable in that circumstance because, since "no . . . bias was apparent, . . . an unequivocal response was not necessary to rehabilitate the juror's impartiality." Id. at 312. By contrast, of course, it is applicable here, where there was reason to believe the juror could not stand indifferent based on the juror's explicit statement that he could not be fair or impartial.

Consistent with case law, when the defendant moved at the end of the colloquy for the juror's discharge he should have been excused for cause. That should have been the end of this case. No one would want this juror sitting on his or her own case, and the defendant was not required to have him sitting on his.

In support of its conclusion to the contrary, the majority's most fundamental conclusion is that the juror's concerns "centered on his frustration about the inconvenience inherent in performing jury service. It did not reflect

partiality or bias such that retaining him constituted reversible error."  Ante at      .  Thus even if the judge "credited" the juror's statement that his "scholastic concerns" made it impossible for him to be fair and impartial, this was "not a basis to discharge [the] juror."  Ante at      .

This is meritless.  The law is clear that jurors must fairly, impartially, and attentively consider the evidence before them and the judge's instructions.  See, e.g., Commonwealth v. Dickerson, 372 Mass. 783, 794 (1977) ("only jurors who will fairly and attentively consider the evidence before them" may be seated).  The majority concedes as much. See ante at      ("When evaluating juror impartiality," judges must among other things inquire whether potential jurors can "properly weigh the evidence, and follow the judge's instructions").  That juror no. twelve's inability to fairly and impartially attend to the evidence and the judge's instructions arose from the burdens the juror concluded were put on his studies by jury service obviously does not render his service proper.

To the extent the majority by this language means otherwise, i.e., that there are some jurors who cannot be fair or impartial who may nonetheless sit, the case they cite of course does not support that proposition.  Commonwealth v. Campbell, 51 Mass. App. Ct. 479 (2001), rather, held correctly

that "[a] juror's complaints about the length of the proceedings, or expressions of frustration about having to serve as a juror, do not necessarily reflect the juror's inability to perform his or her function as an impartial trier of fact." Id. at 483-484. The court there made clear that, unlike in the instant case, "[t]here was no indication that the juror's complaints . . . reflected an inability to perform his function as an impartial trier of fact." Id. at 484.

By contrast, in this case that inability is precisely what the juror asserted. The juror's statements were not merely understandable complaints or expressions of frustration, something that, the majority tells us, need not be taken "as an indicator of partiality." Ante at        . They were actual statements by a juror who believed that he could not be fair and impartial. As the rule requiring an unequivocal statement from a juror that he or she will be fair and impartial makes clear, there is no variety of unfairness or partiality that is tolerable in a juror, and holding otherwise, as the majority appears to do here, contravenes centuries of precedent to the contrary: "[W]here there is abundant latitude for selection [of jurors,] none should sit who are not entirely impartial. This is equally demanded by the general principles of the common law, (Hesketh v. Braddock, 3 Burr. 1856,) and by those of our own constitution, requiring all judges to be as free, impartial and

independent as the lot of humanity will admit.  Declaration of Rights, art. 29."  (Emphasis supplied.)  Davis v. Allen, 11 Pick. 466, 467-468 (1831) (Shaw, C.J., for a unanimous court).

If instead the majority means only to say that the juror was, in fact, merely frustrated, and did not actually mean that he could not be fair and impartial, such a finding of fact -- one never made by the trial judge (notwithstanding the majority's suggestions), and which cannot be made properly by an appellate court on appeal -- is foreclosed in this case by the case law that allows a finding that a juror will be fair and impartial only where a juror states unequivocally that he or she will be impartial.[1]  Put another way, the law mandates a particular method for determining whether jurors can be fair and impartial, a method designed to make sure no unfair or partial juror sits:  the judge is required to ask them if they can be, and to take them at their word.  This is precisely why, "[a]s a

---

[1] The majority goes so far as to assert that the judge "credited the juror's statements as being unequivocal," ante at      .  The transcript shows that the judge made no finding that the statements were unequivocal nor, as the text makes clear, could he.  Nor did the judge's hastily prepared findings, made in writing during the brief pendency of the Commonwealth's own interlocutory appeal from the judge's denial of its motion to discharge the juror, say there was an unequivocal statement by the juror that he could be fair and impartial.  Indeed, they do not, and could not, say even that the juror said he could be fair or impartial.

general principle, it is an abuse of discretion to empanel a juror who will not state unequivocally that he or she will be impartial."  Colton, 477 Mass. at 17.[2]

The majority also holds that "the judge could properly conclude that he had allayed the juror's school work concerns," ante at            , without any citation to the record of what the juror actually said.  Here is what the juror said:  After the juror confirmed that he had contacted university officials and that they had told him that they would "work with [him]," the judge asked, "Are you going to be able to be fair to this guy and this woman in their respective cases?  Are you going to be able to listen attentively to my instructions?  Are you going to be able to listen to the evidence?"  The juror responded, "I

---

[2] The majority asserts that I am advancing a "'rule' . . . without support," ante at          .  But the text quoted supra is contained in the Supreme Judicial Court opinion in Colton, which I cite.  Quarreling essentially with that decision, the majority says that the rule "would strip the judge of any discretion to assess a juror's credibility and would relegate our appellate role to simply determining whether all of the 'magic words' had been spoken in the colloquy."  Ante at          .

Determining whether someone said something unequivocally does not involve a credibility determination, nor does requiring an unequivocal answer to one question mean that a colloquy is nothing more than a series of required words. Finally, no "magic" words must be spoken.  Just some version of the word "yes" -- even, "Yes, I think so," may suffice, see Colton, supra -- something the juror here, even under pressure from the judge to "step up to the plate," indeed, even after agreeing to sit, could never bring himself to say.

would definitely do my best, but I can't promise anything," words that, as described <u>supra</u>, as a matter of law, cannot suffice to show that a juror whose impartiality is in question can stand fair and impartial. See <u>Vann Long</u>, 419 Mass. at 804.

Concluding that the juror's response meant that the juror's concerns were <u>not</u> allayed -- which is what the words mean -- the judge immediately asked him what would "interfere with" his ability to exercise these three essential functions, and the juror responded, "Just fear of, just completely falling behind and failing my classes and just all the stress of everything." The judge responded, "But I thought that the [university] was going to give you a little bit of an antidote, <u>maybe not enough</u>" (emphasis supplied). The juror then <u>agreed with the judge</u> that what the school would give him was <u>not</u> enough: "They will give a little more time, but that still means doing double the work in the same amount of time." The only other statements the juror made on the subject were, "I agree that you're telling me to man up, and I will," which the judge told the juror was somehow a misinterpretation of what he (the judge) had said, and, "I simply don't know," in response to the suggestion that he would be "a perfect candidate" to listen to the evidence and to deliberate on the case. Not one of the juror's statements even hints at the possibility that the judge had allayed his concerns.

The other reasons given by the majority for refusing to take the juror at his word are insubstantial.  Stating that he could not be fair and impartial could not have been a "habit[] of speech" that did not mean that the juror could not be fair and impartial.  See ante at        .  Indeed, the case in which the "habit[] of speech" language appears was one in which the court concluded that a juror who said he "would really hope" that he could be fair was not utilizing a mere habit of speech, but was asserting that he could not assure the judge that he could be impartial.  Vann Long, supra.  Today is the first time either of our appellate courts has held that the words of someone who did not unequivocally state that he could be fair and impartial might merely have been a habit of speech.  Yet no halfway competent English speaker would habitually use the phrases, "I believe that the stress of missing school will result in [a partial] decision on my part," "I am terrified that I will fail my classes and do not know if I can make a fair decision in the future," or "I can't promise anything," with respect to fairness to the parties or ability to listen to the evidence or the instructions, to mean, "I can be fair and impartial."

Nor, of course, is it particularly impressive -- though the majority finds it "notabl[e]," ante at        -- that the juror "never again raised his concerns," when he had already twice

done so only to be told by the presiding judge, on the bench and in a robe, to "step up to the plate." And while, doubtless, "the judge was uniquely situated to measure juror no. twelve's demeanor and credibility," ante at ____, the judge never suggested that juror no. twelve was not credible or that his concerns should not be taken at face value. Because the juror would not state unequivocally that he would be fair and impartial, indeed because he would not even say that he thought he could be -- even as he agreed to sit because the judge told him to "step up to the plate" -- there is no basis in the record for a finding that he would. And no amount of meaningful gazing by a judicial officer into this juror's eyes could render his statements unequivocal expressions of an ability to be fair and impartial.

At the end of the day, there is not a single statement in the record, and the majority does not purport to point to one, in which juror no. twelve in fact said that he could be fair and impartial. This is all that is needed to decide the case and on this basis alone I would reverse.

But of course there is on this record much more. Because after the jury had been instructed, but before deliberations began, this selfsame juror sent another note to the judge, this one stating, "I believe I may know information that would affect

my ability to judge the case based solely on the information received in the trial."

B. <u>After the jury were instructed</u>. 1. <u>Facts</u>. Called to sidebar after sending the note just described, juror no. twelve said, "I heard about how the jury actually has more power than you expressed, that they can judge not only based on just information, but whether they believe the law is fair, or their personal convictions . . . to judge guilty or not guilty."

The judge explained that what the juror had heard about was jury nullification. The judge said, "That is not permitted. That is definitely not permitted . . . ." Nonetheless, the juror still hesitated when the judge asked, "Is there any question of your ability to be able to take the law as I gave it to you, and apply it to the facts as you and your other jurors find them?"

The judge decided therefore to go through the law on which the entire jury had been instructed, element by element, asking this one juror whether he had any difficulty understanding that law and applying it to the facts as he found them. When the judge reached the point of explaining the elements of possession of a weapon, and in particular that knives with certain kinds of casements, when one-and-one-half-inches in length or longer, are defined as dangerous weapons, he asked, "Do you have any problem with taking the law as I give it to you, the statute that I gave

you, and applying it to the facts as you might find them?" and juror no. twelve said, "I don't believe that the law should be that a knife of that size should be a dangerous weapon, but I guess . . . ."

The judge then said, "Well, you know what you get to do with that, and I'm not being facetious, you get to call up your legislator and you get to ask him to change the law, but that's the law as it is right now."  The judge then went on to quarrel with the juror's understanding of the law on which he had now twice been instructed, saying, "It's not one-and-a-half inches, it's with that casement . . . ."  When finally asked again, "Do you have any problem applying that law?" the most the juror would muster was, "I guess not."

Still, the judge did not dismiss the juror.  But, correctly, the judge did say, "I guess not is not good enough for me because it's something that you may disagree with."  He then went on, "You have every right.  I disagree, we all disagree with some of the laws as it relates to some of the things that are prohibited by our government. . . .  But that's what the law is, and as a juror, regardless of your personal beliefs you have to apply the law.  Will you be able to do that?"

Having thus been told that "yes" was the only answer that the judge would accept -- "I guess not is not good enough," the

judge said -- the juror did not even then say yes.  He responded
again, "Well I thought that the jury had the power to choose
whatever way to . . . ."  The judge interrupted the juror and
said, "I just told you it doesn't," which is incorrect as a
matter of law, see Commonwealth v. Hebert, 379 Mass. 752, 755
(1980) ("[I]t remains within the power of a juror to vote his or
her conscience").  The juror responded, "So, there's a legal
punishment if the jury does not . . . ."

   He was cut off by the judge, who misunderstood the juror's
statement, thinking that he was addressing punishment of the
defendant when, as the record reflects, the juror meant that he
misunderstood the judge to have told him -- what is also
incorrect -- that he (the juror) would be punished by law if he
engaged in jury nullification.[3]

---

[3] I note that, while courts have long held that jurors
should not be instructed that they have the power to nullify, no
court of which I am aware has ever approved an instruction --
erroneous as a matter of law -- that the jury lacks this power.
See Hebert, supra ("[I]t remains within the power of a juror to
vote his or her conscience"); Commonwealth v. Floyd P., 415
Mass. 826, 832 n.6 (1993) ("Cases acknowledge that, while it is
improper for a jury to take such action, in practice they have
the power to accomplish such a result").  While the judge
therefore should not instruct a juror that he or she has the
power of nullification, it also cannot be permissible to
instruct a juror falsely that he or she lacks the power to vote
his or her conscience, or to leave an impression that there is
some punishment that may be associated with doing so.  The
majority does not even attempt to justify the judge's erroneous
instruction, and claims only that "the matter is not before us."
Ante at        .  But the defendant argued on appeal that "it

At this point, unsurprisingly, the defendant requested again that the juror be discharged and, equally unsurprisingly, the Commonwealth joined in that motion.

2. Analysis. Although of course the Commonwealth here argues in support of the verdict, at trial the prosecutor joined in the motion to discharge the juror based "on what [juror no. twelve] said from Day 1 that he couldn't be impartial after the opening statements and hearing from the first witness, and the fact that again now he's saying he doesn't believe that the law --." The judge denied the motion. (And, less than two hours later the prosecutor informed the judge that she had filed a motion under G. L. c. 211, § 3, to the single justice of the Supreme Judicial Court on an emergency basis to stay proceedings, and appealing the refusal to discharge juror no. twelve, a request that, given its interlocutory posture, the single justice unsurprisingly denied.) Having failed to persuade the judge, the Commonwealth is not technically judicially estopped from defending the seating of the juror here, see Otis v. Arbella Mut. Ins. Co., 443 Mass. 634, 644 (2005) (judicial estoppel precludes party from "asserting a

---

remains within the power of a juror to vote his or her conscience," quoting from Hebert, supra, and that "the judge did not so instruct this juror." Although I do not believe we need to reach the issue, this does suffice to raise it.

position inconsistent with a position previously <u>and</u>
<u>successfully</u> asserted" [emphasis supplied]), but its postverdict
defense of the seating of the juror rings particularly hollow in
light of its strenuous challenge to the juror at the time of
trial.

By the time of the joint motion to excuse the juror, he had
repeatedly stated an inability or an unwillingness to apply the
law as given, and he should have been excused for cause.
Indeed, there can be little doubt that the judge's lengthy and
repeated statements to the juror -- including both a refusal to
accept an answer that the juror could not follow the law, and
leaving the juror with the incorrect impression that he could be
punished for voting his conscience -- may well have "affect[ed]
the juror's judgment."  <u>Hebert</u>, 379 Mass. at 755 (judge's
"coercive" interaction with juror, where juror believed that
Commonwealth had proved each element of crime beyond reasonable
doubt but could not in good conscience convict, was improper);
<u>Auguste</u>, 414 Mass. at 58 (juror may not be seated on basis of
"answers suggested or, in fact, required by the [judge's]
questions").[4]  For this independent reason, the juror should have

_____

[4] The majority is of course correct that the judge did not
tell the juror that he would be punished for engaging in jury
nullification, but this does not change the fact that the juror
clearly, and incorrectly, believed that he could be punished.
The majority's implicit conclusion -- that it somehow matters

been dismissed.  And even if either his statements on the first and second days of trial, or his statements after the jury were instructed, alone would not have warranted it, certainly taken together they required his dismissal.

Although I appreciate that trial judges sometimes may have a difficult task in ensuring that jurors do not impermissibly avoid their obligation to serve, and while the judge's decision not to dismiss juror no. twelve appears to have been at least partially motivated by the desire to avoid a mistrial,[5] as both

_____

that the judge is less blameworthy for neglecting to correct the juror's obvious misconception than he would have been for creating it -- is plainly wrong.  See ante at        .  Our question is whether the defendant received a fair trial, and the fact is that a citizen entered the jury room believing falsely that he could be punished for voting his conscience.

[5] After his colloquy with juror no. twelve on the second day of trial, the judge stated, "I'm going to keep it as a work in progress.  He's not going to be a juror that is going to deliberate if he's impaired.  I'm with you on that part of it, and I think I may do a little inquiry as to the detail of this letter, and I think I did a splendid job of trying to salvage this so you don't mistry the case . . . ."  Also, after learning that the defendant and the Commonwealth were seeking relief from the single justice of the Supreme Judicial Court, he (the judge) requested that a court room clerk transmit certain statements to the clerk of the Supreme Judicial Court, including that, "The jury has been reduced to thirteen, and one of the jurors received a commitment from this Court that they would [be] released from duty to complete travel plans, and it is likely that a mistrial will occur.  Further, there are factual misstatements in the petition that can be addressed by a transcript which this Court has ordered, and at the present time this trial judge, having had the ability to inquire of the challenged juror is satisfied that he ought not to be discharged, period."  The inconvenience to either party or to

parties recognized below, he pushed too hard in this case, and impermissibly failed to excuse juror no. twelve for cause.

For these reasons, it seems to me that a reversal of the judgments is required.  I therefore respectfully dissent.

---

the judge of declaring a mistrial of course properly has no bearing on the question whether a juror stands fair and impartial.